SAXMAN COAL & COKE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19084.   Promulgated February 15, 1929.

*W. W. Spalding, Esq.*, for the petitioner.
*H. LeRoy Jones, Esq.*, for the respondent.

## OPINION.

SMITH: Upon organization in September, 1909, the petitioner acquired in exchange for shares of capital stock two leaseholds to coal lands which were set upon its books of account at $86,500. It claims that the cash value of the leaseholds at the date of acquirement was $86,500 and that the respondent erred in excluding that amount from invested capital.

Leases were acquired by a predecessor corporation without any capital investment therefor. The predecessor corporation had done some development work and small quantities of coal had been mined. The evidence shows that the coal was of high quality and that there was a ready market for practically all that the company could mine in the town of Richwood, some six miles distant. The freight differential gave the petitioner a practical monopoly of this market so long as no other mines were developed in the immediate territory. The lessors had agreed to give the petitioner the use of a branch line to be built by them for the handling of the coal. The lessee was required to maintain the line.

Shortly prior to the organization of the petitioner a mining engineer by the name of John d'Invilliers had made an examination of the petitioner's leaseholds for the purpose of determining whether the outlook warranted the predecessor corporation to float a $200,000 bond issue. His report was favorable. He was of the opinion that there were 20,000,000 tons of unmined coal in the demised lands and that operative conditions would be such as to enable the company to pay off the bonds and operate the property at a profit. In his report he stated, however, as follows:

While, as previously stated, the integrity of the seam has not yet been established below water level to the north and west of the Cherry lease, nor upon the Little Laurel side of the Gauley lease, the openings made at short intervals for a distance of 4 miles along the valley of the main Big Laurel Creek, coupled with the mine developments at Saxman, indicate a general value of over 3' 0'' for the region.

Therefore, if a unit of thickness of but 3' 0'' be used as a basis for computation of tonnage resources over the 6,000 acres of available coal-land controlled—and that is the minimum thickness required to be mined by the terms of each lease—the reserve tonnage in both properties will approximate 20 million tons.

That the coal seam at best is thin, as well as being subject to rolls and squeezes, is fully recognized by all in interest and has been fully discounted in the preparation of the agreements of lease;  *  *  *

We are of the opinion that the report of d'Invilliers falls far short of proving a cash value for the leaseholds in question. At the time they were made there had been but little development work on the leaseholds and the engineer's estimates were based upon his general knowledge of the property and upon assumptions with respect to operative conditions which had not been proven. The coal veins were thin and it was not known whether the coal in them could be mined at a profit. The lessors owned approximately 175,000 acres of coal lands and they were anxious to lease them or sell them at a profit. They hoped to be able to point to the petitioner as a successful operator upon their lands. They were therefore willing to construct a railroad at their own expense to assist the petitioner to make a success of its enterprise. Nothing had transpired up to September, 1909, which showed that the coal leases had a cash value.

The principal reliance of the petitioner for establishing a cash value for the leaseholds in September, 1909, is a retrospective appraisal made in 1926 by a mining engineer, G. M. S. Tait, who determined their fair market value in 1909 to be $90,996.11, which computation is as follows:

| Year | Sales price at mine | Total cost | Operating profit | | Sales price at mine | Total cost | Operating profit |
|---|---|---|---|---|---|---|---|
| 1909 | $1.300 | $1.175 | $0.125 | 1915 | $1.254 | $0.967 | $0.287 |
| 1910 | 1.220 | 1.040 | .180 | 1916 | 1.302 | 1.024 | .368 |
| 1911 | 1.260 | 1.216 | 1 .044 | | | | |
| 1912 | 1.538 | 1.217 | .321 | | | | 2.004 |
| 1913 | 1.377 | 1.038 | .339 | Average | | | .2505 |
| 1914 | 1.330 | .990 | .340 | | | | |

1 Abnormally low profit.

Average yearly estimated minimum production for life of lease (30 years) _____tons___ 80,000
Total estimated production during 30 years_____do____ 2,400,000
Estimated operating profit per ton_____ $0.2505
Total estimated profit during life of lease_____ $601,200.00
Discounting for 30 years at 8% and 4% (factor)_____ $0.340726
Present worth of total estimated operating profit to be realized during life of lease_____ $204,844.47
Less: Plant, equipment and development as at 1909 (as shown by books)_____ $113,848.36

Estimated value of leasehold at date of acquisition (1909)_____ $90,996.11

In this computation the engineer has made assumptions with respect to the estimated minimum production of the company that was not known in 1909. In making the estimate he did not have the benefit of the report made by John d'Invilliers in 1909, although he estimated a minimum annual production of 80,000 tons. The record shows that the production in 1909 was in round numbers only 33,000

tons and the highest production reached prior to 1913 was only 56,000 tons. The record further shows that the average annual production of the company for the entire 19 years of its life was only 68,000 tons. Furthermore, the basis of the engineer's assumption that the profit per ton of coal produced was 25.05 cents is not apparent. The operating profit for normal years was far less. Likewise, his assumption that 8 per cent was a fair return on capital invested is not borne out by any evidence. A mining expert for the Government testified that in his opinion a fair return on capital invested in a mining enterprise such as that of the petitioner, the risks being considered, would not be less than 20 per cent.

The respondent has determined that the leaseholds had no cash value in 1909. The burden of proving that they had a cash value is on the petitioner. *Thomas J. Avery*, 5 B. T. A. 872. We think that that burden has not been carried.

The coal seams in the leasehold properties were thin and subject to rolls and squeezes. It had not been proven in 1909 that they could be operated at a profit and subsequent events show that they could not be if royalties were to be paid at the rate of 10 cents per ton. It was for this reason that one of the lessors modified the lease agreement in December, 1913, to provide for a royalty of only 5 cents per ton, and the other lessor reduced the royalty payment up to 1922 without modifying the lease. The exclusion of the claimed capital value of the lease for invested capital purposes made by the respondent is sustained.

The petitioner further contends that the leaseholds had a capital value at March 1, 1913, of $91,808.32. In support of this contention there has been offered in evidence the retrospective appraisal of engineer Tait made in 1926. His computation of the March 1, 1913, value is as follows:

| | |
|---|---|
| Total estimated tonnage during 26 years remaining life of lease | 2, 189, 369 |
| Estimated operating profit per ton | $. 2505 |
| Total estimated profit during life of lease | $548, 436. 94 |
| Discounting for 26 years at 8% and 4% (factor) | . 374988 |
| Present worth of estimated operating profit to be realized during remaining life of lease | 205, 657. 27 |
| Less average investment in plant, etc | 113, 848. 36 |
| Estimated value of leasehold March 1st, 1913 | $91, 808. 32 |
| Depletion rate on March 1st, 1913 valuation | $. 042 |

The same observation made above with respect to engineer Tait's appraisal as to the 1909 value applies also to his estimate of the March 1, 1913, value. If anything, the proof as to the March 1, 1913, value is weaker than that with respect to the September, 1909, value; for by March 1, 1913, the petitioner had proven that it could not operate profitably under the leases. For that reason the lessors, upon

the request of the petitioner, reduced the royalty payments required by their leases. The leases were not modified, however, until after March 1, 1913, and then only the lease from the Gauley Coal Land Co. was modified.

This Board has held many times that the value of assets as of the date of acquirement by a corporation for stock, or as of March 1, 1913, for the purpose of determining a reasonable allowance for depreciation or depletion, should be determined on the basis of facts known at the time of acquisition or facts reasonably anticipated. Subsequent events or earnings when reasonably anticipated may be shown for the purpose of demonstration or corroboration of actually existing values. *Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179; *J. J. Gray, Jr.*, 2 B. T. A. 672; *Keller Mechanical Engineering Corporation*, 6 B. T. A. 990; *James Couzens*, 11 B. T. A. 1040

In the instant proceeding we have the facts that the petitioner could not operate at a fair profit under the leases which it had. We note, of course, that for the first two or three years of operation the properties were in a development stage. The leases, however, required minimum productions far in excess of the amounts of coal mined for the years 1912 and 1913. The petitioner, not being able to operate at a profit under the leases, persuaded the lessors to abate a part of the royalties due under the leases for the years 1912 and 1913. To offset this competent evidence of the value of the leaseholds the petitioner offers the appraisal made by engineer Tait in 1926. As above indicated the evidence does not support the basic figures used by the appraiser in making his estimate.

From a consideration of all of the evidence we are of the opinion that the leaseholds possessed by the petitioner on March 1, 1913, had no fair market value on that date.

*Judgment will be entered for the respondent.*